**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL HARMON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 4:14 CV 1615 DDN |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Michael Harmon for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, 1381. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 9.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I. BACKGROUND

Plaintiff was born on August 1, 1967. (Tr. 270.) He filed his applications on July 23, 2009. (Id.) He alleged an onset date of February 1, 2008, and was unable to work due to chronic back pain, anxiety, high blood pressure, and bronchitis/breathing problems. (Tr. 317.) Plaintiff's applications were denied and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 125–35.)

The ALJ held hearings on October 7, 2010 and January 3, 2011 and determined that plaintiff was not disabled on March 14, 2011. (Tr. 62–92, 96–113.) On May 25, 2012 the Appeals Council granted plaintiff's request for review and remanded the case to

the ALJ with instructions to obtain additional evidence regarding the severity and limiting effects of plaintiff's impairments; evaluate plaintiff's mental impairments using the special technique; give further consideration to plaintiff's maximum residual functional capacity (RFC) and provide specific citations supporting the determination; give further consideration to "other source" opinions; evaluate further plaintiff's subjective complaints and provide rationale for discrediting them; and obtain, if needed, supplemental evidence from a vocational expert (VE). (Tr. 122–23.)

The ALJ held an additional hearing on April 8, 2013 and again found plaintiff not disabled on April 19, 2013. (Tr. 10–30; 37–61.) The Appeals Council chose not to rehear plaintiff's case, and, therefore, the second decision of the ALJ is the final decision of the Commissioner. 20 C.F.R. § 404.984(d).


## II. MEDICAL AND OTHER HISTORY

Several times in 2007 plaintiff saw Joseph Elterman, M.D., for his hypertension. (Tr. 463–65.) He was admitted to Jefferson Memorial Hospital for hypertension, fatigue, and anxiety from May 17 to 19, 2007. (Tr. 517-22.) During this time Dr. Elterman prescribed Klonopin for anxiety, Vasotec for hypertension, hydrochlorothiazide for hypertension, and Toprol XL for hyperthyroidism. (Id.) While in the hospital, plaintiff also had a normal heart stress test (Tr. 462) and a normal electrocardiogram (EKG). (Tr. 528–29.)

On July 30, 2007, plaintiff had a psychiatric evaluation at Advanced Psychiatric Services. Plaintiff's Global Assessment of Functioning (GAF) score was 38. (Tr. 486.) A GAF of 38 indicates either "some impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."[1]

---

[1] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34-35 (4th ed. 2000) ("DSM IV").

Plaintiff went to Advanced Psychiatric Solutions on August 27, 2007, but the notes from the psychiatric visit are illegible. (Tr. 486, 685.)

On September 27, 2007, plaintiff went to a psychiatric visit and it was noted that he was on clonozepam (anxiety), Celexa (depression), as well as two other medications which were illegible. (Tr. 485, 686.)

From September 30 to October 24, 2007, plaintiff went to Advanced Psychiatric Solutions five times for therapy, centering on his relationship with his girlfriend. There were no suicidal ideations, but the majority of the writing was illegible. (Tr. 459, 481, 485, 487, 686.)

Plaintiff was admitted to Jefferson Memorial Hospital's Emergency Room on November 12, 2007, complaining of depression and anxiety. He claimed suicidal ideations in the past week and that he took seventeen unknown medications last week but vomited them up, then lied about it. (Tr. 508–09.)

On November 14, 2007, plaintiff went to Jefferson Memorial Hospital's Emergency Room stating he ran out of clonazepam, his anxiety medication. (Tr. 504.)

On November 15, 2007, plaintiff was seen at Advanced Psychiatric Solutions for psychiatric care. His medications for clonazepam, Celexa, and three illegible medications were continued. (Tr. 477, 687.)

On November 29, 2007, plaintiff went to the emergency room stating he ran out of clonazepam again. The emergency room had Advanced Psychiatric Solutions refill his prescription. (Tr. 476–78, 687–88.)

On December 20, 2007, plaintiff went to Advanced Psychiatric Solutions. His medications were not changed. He reported working a few days but still had nothing permanent. He continued to look for permanent work. (Tr. 475, 689.)

From February 28 to September 25, 2008, plaintiff visited Advanced Psychiatric Solutions five times. His medications were unchanged. Several times plaintiff reported that he was actively looking for work. (Tr. 472–75, 689–92.)

On November 17, 2008, plaintiff reported to Advanced Psychiatric Solutions that he had lost his job of two weeks.  His medications remained the same.  (Tr. 692.)

On November 21, 2008, plaintiff was seen for a psychiatric visit after his girlfriend died in a truck crash.  (Tr. 471.)

On January 12, 2009, plaintiff had a regular psychiatric visit and reported that he was actively looking for jobs.  (Tr. 471.)

On February 11, 2009, plaintiff was seen by Joseph Elterman, M.D., who noted that his lungs were clear.  Most of the notes are illegible.  (Tr. 458.)

On March 19, 2009, plaintiff reported he was still looking for work.  (Tr. 471, 693.)

On March 19, 2009, radiologist Paula Leiva, M.D., compared plaintiff's x-ray with one taken on May 19, 2007 and found no problems with plaintiff's heart or lungs.  (Tr. 503.)

On May 7, 2009, Dr. Elterman reported that plaintiff was having trouble breathing and ordered a pulmonary function test.  On May 11, 2009, the pulmonary function test showed severe airway obstruction, characteristic of emphysema but it had a reversible component.  It was noted at the time that plaintiff was till smoking despite breathing problems.  (Tr. 447, 455, 457, 498.)

On July 16, 2009 Janet Murdick, Clinical Nurse Specialist (CNS) and Advanced Nurse Practitioner (ANP) saw plaintiff at Advanced Psychiatric.  The notes and medications are illegible.  (Tr. 567.)

On July 30, 2009, plaintiff went to the Jefferson Regional Medical Center's Emergency Room complaining of hypertension and sinus problems.  (Tr. 495–97.)

On September 24, 2009, Joan Singer, Ph.D., completed a physical residual functional capacity assessment of plaintiff and stated that he had hypertension and asthma.  He had no external limitations but his postural limitations include:  climbing, balancing, stooping, kneeling, crouching, and crawling.  There were no limitations in manipulating items, vision, or communication.  He would have problems with extreme temperatures,

wetness, noise, and vibrations. Dr. Singer determined the severity of his condition was "partially credible." (Tr. 530–33.)

Dr. Elterman followed-up with plaintiff on his breathing issues and a pulled muscle on September 24, 2009. (Tr. 564.)

Nurse Murdick saw plaintiff on September 28, 2009, and noted medications but the notes are illegible. (Tr. 567.)

Dr. Singer performed a mental residual functional capacity assessment of plaintiff on October 1, 2010, and found plaintiff had no marked limitations in any category. He is moderately limited in eight categories: understanding and remembering instructions, carrying out detailed instructions, extended periods of concentration, working with others without distraction, completing a workday without interruptions for psychological based symptoms, and interacting appropriately with the public, supervisors, and peers. Dr. Singer found the plaintiff only partially credible. (Tr. 539–49.)

Nurse Murdick saw plaintiff three times between October 20, 2009 and January 11, 2010. She noted plaintiff was having difficulty sleeping but there was no depression or anxiety problem. Plaintiff had no suicidal or homicidal ideations. He was still unemployed. (Tr. 568.)

Dr. Elterman tested plaintiff's cholesterol on March 18, 2010 and noted all levels were elevated. Plaintiff was started on a cholesterol medication, but the doctor's notes as to which one are illegible. (Tr. 560–61.)

Nurse Murdick saw plaintiff on April 19, 2010 and made no adjustments to his medications. (Tr. 570.)

On June 3, 2010, plaintiff went to the Veterans Administration Hospital's Emergency Room complaining of back pain and stated he did not take his blood pressure medication. An x-ray showed grade one spondylolisthesis, the slipping of vertebra, but no bulges or abnormalities. Shaukat J. Chaudhry, M.D., provided him with toradol and naproxen, both for pain. (Tr. 631–33.)

On July 5, 2010, plaintiff went to the Emergency Room at Jefferson Regional Medical Center following an automobile accident. Carl J. Werner, M.D., proscribed him tramadol (for pain), cyclobenzaprine (a muscle relaxant), sulfamethoxazole (an antibiotic), cetirizine (for allergies), acetaminophen-hydrocodone (for pain), and morphine (for pain). An x-ray showed anterior listhesis of his spine at L5 on Sl, suggesting a pars defect of L5. (Tr. 648–51, 699–700.)

On July 21, 2010, Patricia McKenzie, RN, APN, saw plaintiff at the VA Hospital and noted his current medications included: diltiazem (for high blood pressure), simvastatin (for high cholesterol), enalapril (for high blood pressure), proair inhaler, qvar (for asthma), clonazepam, and citalopram (for depression). Plaintiff was started on gabapentin (for pain), and flexeril (a muscle relaxant). His x-rays remain unchanged from earlier scans. Plaintiff was offered smoking cessation help but he refused it. (Tr. 622–27.)

On August 5, 2010, Nurse Murdick provided plaintiff with a one-time emergency refill of his psychiatric medications. (Tr. 570, 697.)

On August 7, 2010, plaintiff's back was x-rayed after complaints of increased pain. There was minimal anterolisthesis. Mild bulges were noted but there was no canal narrowing or neural compression. (Tr. 584.)

On August 13, 2010, Dr. Elterman noted that plaintiff's cholesterol levels were still high but improving. (Tr. 574–75.)

On August 31, 2010, plaintiff fell in the shower and went to the Jefferson Regional Medical Center's Emergency Room complaining of back pain. He was given acetaminophen-hydrocodone and Vicodin for the pain. An x-ray indicated mild decreased intervertebral disc space at L5-S1. At the time he reported that he was still smoking. (Tr. 654–71.)

On September 1, 2010, plaintiff was seen by Bingzhong Chen, M.D., at the Veterans Administration Hospital for low back pain. Dr. Chen increased plaintiff's prescriptions for cyclobenzaprine and gabapentin. An x-ray indicated a mild to moderate

disk bulge at L4-L5 and L5-S1 and minimal grade 1 anterolisthesis at L5-S1.  (Tr. 605–07.)

On September 15, 2010, Dr. Elterman filled out a pulmonary RFC form and diagnosed plaintiff with chronic obstructive pulmonary disease with shortness of breath and moderate breathing attacks.  Plaintiff has an albuterol inhaler.  Dr. Elterman did not fill out any of the specific limitations sections of the form.  (Tr. 576–80.)

Nurse Murdick filled out a mental RFC assessment form on September 20, 2010.  She indicated plaintiff had a current GAF score of 58 and his highest GAF in the past year was 62.  A GAF of 58 indicates that plaintiff has moderate difficulty in social or occupational functioning, while a GAF of 62 indicates mild symptoms or some difficulty in social or occupational functioning.  A GAF of 62 also indicates that the person is generally functioning pretty well and has some meaningful interpersonal relationships. [2] Plaintiff's current psychiatric medications include Celexa, clonazepam, Ambien (for sleep), Elavil.  There are no significant side effects that would prevent him from working.  He is anxious, impulsive, easily distracted, has mood swings, memory impairment, and at least once a week has a panic attack.  Nurse Murdick opines that he would be unable to meet competitive standards of attendance, work in close proximity to others, complete a normal workday without interruptions, work at a consistent pace, or get along with co-workers.  Additionally, he is seriously limited in remembering procedures, short, and simple instructions; carrying out instructions; maintaining attention; making simple work-related decisions; asking simple questions; accepting instructions or criticisms; dealing with normal stress; or, taking precautions for normal work hazards.  She estimates plaintiff would be absent at least two days per month.  (Tr. 675–80.)

Plaintiff was referred to physical therapy for his back pain but did not show up for his appointment.  (Tr. 991.)

Plaintiff was examined by the VA for a regularly scheduled compensation and pension reevaluation regarding his back.  He had previously been declared 20% disabled

---

[2] Id.

by the VA.  (Tr.  570.)  Plaintiff reported continued back pain with intermittent numbness in his left leg 3 to 4 times a week for 5 to 10 minutes.  He had no history of incapacitation due to his back pain.  He could walk for 2 blocks and stand for 3 to 5 minutes.  He stated he cannot do construction work, his prior work, due to the pain.  (Tr. 985–87.)

On January 6, 2011, the VA completed a nerve conduction study of his back pain, which was normal.  (Tr. 837.)

On January 10, 2011, the VA's neurology department increased plaintiff's gabapentin prescription and plaintiff complained he was out of medication again.  (Tr. 981.)

On January 24, 2011, Dr. Elterman reported that plaintiff "shouldn't be working" because of his high blood pressure and COPD.  Plaintiff reported that he quit smoking two months earlier.  (Tr. 708.)

Nurse Murdick saw plaintiff on February 3, 2011.  It appears there are no changes but the notes remain predominately illegible.  (Tr. 706.)

On February 3, 2011, Dr. Elterman opined that plaintiff cannot work due to his high blood pressure and COPD.  (Tr. 707.)

On February 16, 2011, plaintiff visited the Jefferson Health System Urgent Care facility with sinus complaints but x-rays showed no infiltrates or effusions.  (Tr. 773–74, 778.)

On March 8, 2011, plaintiff requested an increase in his gabapentin from the VA hospital.  When he would not coordinate his VA care with his outside provider care, his request was denied.  At that time he became verbally abusive to Nurse McKenzie.  (Tr. 970–71.)

On March 23, 2011, plaintiff was assessed by Amanda E. Avellone, M.D., at the Thoracic & Critical Care Medicine, LLC.  Plaintiff uses his Albuterol inhaler four to six times a day with immediate relief.  He wakes up three out of five nights with shortness of breath.  His current medications include:  clonazepam, Celera, amitriptyline (anti-depressant), zolpidem (sleep aid), diltiazem, enalapril, Ventolin (bronchodilator),

simvastatin, omeprazole (antacid), flexural, vitamin D-3, nystatin (antifungal), gabapentin, ibuprofen, and Benadryl.  His pulmonary health has worsened from the last study, but he still has only minimal COPD.  He probably has asthma and his study suggests pulmonary vascular disease.  (Tr. 710–13.)

On April 2, 2011, Christa Hines, M.D., saw plaintiff after being admitted on a psychiatric hold at the VA hospital for apparently scratching his stomach while he was asleep.  His GAF upon arrival was 40.  During his stay he had an outburst at another psychiatric ward patient and was given haloperidol and lorazepam to calm him down.  While attending several group therapy sessions he was hostile and aggressive and derailed the sessions.  He became combative and uncooperative with his nurse when renewing his inhaler prescription.  His gabapentin was increased and upon discharge his GAF was 60.  (Tr. 804, 823–25, 908, 903–04, 925, 935–36, 945.)

On April 14, 2011, plaintiff was admitted to the VA Hospital for erratic speech and behavior.  He had admitted to marijuana use the day before.  He was diagnosed with major depression, generalized anxiety and marijuana abuse.  There were no suicidal or homicidal ideations.  He was put on the nicotine patch for smoking cessation, but Deborah H. Mango, R.N., noted he removed it in order to go outside and smoke on April 15, 2011.  Nurse McKenzie noted the possible drug interactions between his prescribed medications.  Plaintiff was still smoking two to three cigarettes per day.  Upon discharge, Ryotaro Kato, M.D., noted that his erratic speech and behavior was likely due to drug interactions as well as the use of marijuana one to two times per month.  (Tr. 721–41, 801–03, 818–19, 873–74, 877, 895–96.)

On May 14, 2011, Bob Geng, M.D., increased his gabapentin due to reports of increased back pain.  (Tr. 567–69.)  Plaintiff reported he was attempting to stop smoking again and wanted to slowly step down his nicotine patch.  (Tr. 840.)

On May 18, 2011, plaintiff was seen at a VA outpatient mental health clinic by Michael Jones, LCSW, who noted his history of violent behavior.  Plaintiff claimed he was out of clonazepam again.  Mr. Jones stated that the non-VA pharmacy had provided

enough for him, but that plaintiff never picked up the prescription. Mr. Jones assessed plaintiff's current GAF score at 45. (Tr. 845–54.)

On May 20, 2011, plaintiff's MRI showed a defect at L5-S1, mild degenerative disc disease at T11-12 and L5-S1. He has a bulging disc at L5-S1. The CT scan from August 7, 2010 had shown a disc bulge at L4-L5 and L5-S1. Plaintiff refuses physical therapy, rather, only wants pain management. (Tr. 828–31.)

Plaintiff went to the VA emergency room on June 3, 2011 for a pain attack caused by plaintiff running out of his medication at least three days before. (Tr. 746–64.)

On June 5, 2011, plaintiff was seen for falling while getting out of the tub. An x-ray of the back showed minimal degenerative changes. (Tr. 775–77.)

On July 13, 2011, plaintiff ran out of his psychiatric medication. Antonia J. Gesmundo, M.D., prescribed him more. (Tr. 1117–18.)

On July 27, 2011, plaintiff ran out of his psychiatric medication again and was extremely agitated. The hospital refilled his prescription. (Tr. 1142.)

On August 19, 2011, plaintiff ran out of his clonazepam again. Nurse Peggy Gleason, R.N., ordered a refill. (Tr. 113–14.)

On July 23, 2012, the neurology department at the VA hospital prescribed plaintiff a lidocaine patch for his lower back pain. (Tr. 1031–32.)

On June 18, 2012, the VA mental health clinic reported his GAF as 55, up from 53 on January 28, 2012. (Tr. 1082.)

Plaintiff's MRI on July 30, 2012, showed spondylolisthesis at L5-S1 but otherwise normal. Plaintiff reports only gabapentin works for his pain. (Tr. 999–1000.) Nerve conduction studies resulted in normal findings on August 27, 2012. (1070–71.)

Plaintiff requested a letter from Joanne M. Waltman, M.D., stating that he cannot work. She reports that he is tolerating the current drug regime with no major side effects. He drinks a six-pack of beer twice a week and reports that he does not smoke. In conclusion she stated, "I do not see a pulmonary reason that he would be unable to work." (Tr. 1177–78.)

**First ALJ Hearing**

The ALJ held a hearing October 7, 2010. (Tr. 37-52.) Plaintiff testified to the following facts. He graduated high school and attended general carpentry trade school. The Army trained him as a satellite operator and when he left the Army he had a chauffeur's license. He also trained for two weeks in handling nuclear and radioactive material as a worker at a decommissioned power plant. He had on and off jobs mowing lawns, washing vehicles, and janitorial work. He started receiving unemployment benefits in March 2009 and received them through the ALJ hearing in October 2010. He has applied for telemarking, driving, and other jobs where he would not have to lift anything heavy. (Tr. 65–69.)

He attended inpatient drug and alcohol treatment in 2002. The last time he drank alcohol was March 2008. He is diagnosed with COPD, spondylolisthesis, anxiety, and depression. He is currently receiving psychiatric treatment from Nurse Practitioner Janet Murdick. Nurse Murdick prescribes medications for him under two doctors' supervision, but neither doctor has ever actually seen him. (Tr. 70–74.)

He can drive a car. He takes care of his elderly mother by picking up medications, taking her to appointments, and generally takes care of her. He visits his friend's house where they play video games and eat dinner together on occasion. He can take care of himself including doing the laundry and cooking. He does not clean, but has hired someone to do that for him and his mother. He attends church regularly. (Tr. 75–77.)

The VA had not prescribed him physical therapy yet, but he knows he should be doing it. He testified he can stand for ten minutes at a time and can sit for forty-five minutes at a time. He estimates he can walk about two blocks. He may be able to lift between 25 and 30 pounds. He reports using a cane in order to walk which was prescribed by his VA physicians. (Tr. 78–80.) He reports quitting smoking three to four months prior to the hearing. (Tr. 81.)

During a post-hearing addendum, an oral recitation into the record by the ALJ, the ALJ detailed the inconsistences between plaintiff's testimony and his medical records.

This record addendum was apparently not in the presence of plaintiff or his counsel. A cane has never been prescribed for his use. Additionally, his records indicate that as of August 2010 he was still smoking half a pack of cigarettes a day. Plaintiff is also caring for his mother, who he admits, should be in a nursing home. His x-rays indicate that there are no serious defects or issues with his back or hands. Plaintiff also complained of severe, 9 out of 10, back pain after falling in the shower but managed to easily get out of the wheelchair for a pain shot. His pulmonary assessment is guarded but there are very few details or medical records supporting that assessment. (Tr. 81–84.)

The ALJ held a supplemental hearing on January 3, 2011 in order to allow the plaintiff to cross-examine the vocational expert (VE). The VE had answered interrogatories formulated by the ALJ that restricted him to persons who were limited to understanding, remembering, and carrying out at least simple instructions and non-detailed tasks. (Tr. 87–90.) This equates to unskilled workers. (Tr. 90.) Skilled workers must be able to carry out detailed instructions. (Id.)

**First Decision of the ALJ**

On March 14, 2011 the ALJ issued a decision that plaintiff was not disabled. The ALJ found that he had not been gainfully employed since February 1, 2008. He had been employed off and on during the claims period but all jobs ended quickly and at least once due to his medical condition. (Tr. 101.) The ALJ found that he had the following severe impairments: degenerative disc disease, generalized anxiety disorder, and depression. Plaintiff's COPD was considered non-severe. (Tr. 102.) The ALJ then found that none of these impairments or combination of these impairments met or medically equaled one of the listed impairments. (Tr. 104–05.) Additionally, the ALJ assessed his mental impairments using "paragraph B" criteria and found that plaintiff had only mild restrictions regarding daily activities, mild difficulties in social functioning, and can has moderate difficulties regarding concentration, persistence, or pace. There have been no

episodes of decompensation. Additionally, the ALJ found that "paragraph C" criteria were also not met. (Tr. 105–06.)

The ALJ determined that the plaintiff's Residual Function Capacity (RFC) included the ability to perform light work, but which required him to understand, remember, and carry out no more than simple instructions and non-detailed tasks. Plaintiff could maintain concentration for two hour segments over eight hours. He has adequate judgment for simple work-related tasks. Contact with coworkers and supervisors should be infrequent. He can adapt to routine or simple changes and take appropriate precautions against hazards. Plaintiff would be able to maintain regular attendance without special supervision and perform at a normal pace without production quotas. (Tr. 106.) The ALJ found that plaintiff can no longer perform his past relevant work. (Tr. 111.)The ALJ then concluded plaintiff was not disabled, because he could perform jobs that exist in significant numbers in the national economy. (Tr. 112.)

**Second ALJ Hearing**

The Appeals Council remanded the case to the ALJ, ordering the ALJ to obtain additional evidence; clarify the nature and severity of the impairments; evaluate the nature, severity, and limiting effects of claimant's pulmonary impairment; evaluate the mental impairments with the special technique; and, reevaluate the RFC. The ALJ was also required to provide decisional rationale, including the weight given to non-examining source opinions; to provide the rationale for disregarding plaintiff's subjective complaints; and to obtain a supplemental assessment from the VE. (Tr. 122–23.)

The ALJ held a second hearing on April 8, 2013. (Tr. 37–61) The plaintiff attended the second hearing and was represented by an attorney. (Tr. 568.) Plaintiff testified to the following facts. He completed high school and received training in carpentry, the military, radiation and nuclear material, and satellite operations. He also has a chauffeur's license and has operated a dump truck, but received no special training for this work. He looked for work in 2010 as a telemarketer or truck driver. He was in inpatient alcohol

rehabilitation in 2000.  Plaintiff claims he no longer drinks alcohol but medical records indicate consumption of two six-packs of beer every week.  Plaintiff did not dispute this when confronted by the ALJ.  (Tr. 41–43.)

Plaintiff stated he has degenerative disc disease, COPD, and panic anxiety disorder. His degenerative disk disease is being treated at the VA Hospital.  His nerve conduction study was normal.   The MRI indicated spondylolisthesis of L5 and S1 with age-appropriate degeneration.   Plaintiff started using a cane around 2000 when the VA prescribed it for him.  (Tr. 43–46)

Plaintiff testified he has problems moving around and bending over.  He can sit for only thirty minutes but does not put a limit on how much walking he could do.  He lays down two or three times a day for at least thirty minutes at a time.  He takes pain medication but has not seen a pain management specialist.  He receives disability for his back from the VA.  He has COPD which shortens his breath and makes it very hard to breathe.  He takes medications for his COPD and asthma which are working.  Plaintiff says he quit smoking six months ago.  He has panic and anxiety attacks as well as acute depression.  He said that he has two panic attacks a day that last around thirty minutes to an hour.  He takes medication for them and he reports it is working.  He also stated his depression has been around for two to three years and results in him lacking motivation, and enthusiasm, and feeling desperate.  (Tr. 46–52.)

Plaintiff can drive but currently has no vehicle.  He takes care of his mother by doing the laundry, helping her move around the house, buying groceries, and cooking. Plaintiff says he no long goes anywhere; he has no leisure activities.  His sleep is fair when he takes his prescribed Ambien.  (Tr. 53–55.)

The Vocational Expert (VE) testified by phone at the hearing.  He recited plaintiff's work history which included ten jobs, but the VE found that he could perform only one of them now.  This is as a caregiver for his elderly mother, but is untrained; so, it is an unskilled job with a medium exertional level.  The ALJ limited plaintiff to work that would not involve ropes, ladders, scaffolding, hazardous heights, fumes, odors, dust, and

gasses. Also the ALJ limited plaintiff to only unskilled work. In addition to the job as a caregiver, the VE found that plaintiff could perform work as a kitchen helper, packaging, or as an unarmed security guard. All of these are light, unskilled work. Plaintiff's counsel asked the VE whether his answer would change, if the hypothetical person was required to work away from people. The VE stated that his answers would change, because nearly all jobs at any level require interaction with people at some level. (Tr. 56-60.)

### III. DECISION OF THE ALJ

On April 19, 2013 the ALJ found plaintiff not disabled. (Tr. 13–36.) At Step One the ALJ found that plaintiff met the insured status requirements through September 30, 2013 and had not been engaged in substantial gainful activity since February 1, 2008, his alleged onset date. (Tr. 13–15.)

At Step Two the ALJ found plaintiff had the severe impairments of chronic pulmonary disease, degenerative disc disease, generalized anxiety disorder, and depression. His hypertension was considered a non-severe impairment. (Tr. 16.)

At Step Three, the ALJ discussed each impairment and compared plaintiff's symptoms to those listed in the C.F.R. The ALJ found none of his impairments, alone or in combination meet or are medically equivalent to a presumptively disabling impairments in 20 C.F.R Part 404, Subpart P, Appendix 1. Additionally, the ALJ considered plaintiff's mental impairments under the "paragraph B" and "paragraph C" criteria[3] and found these criteria are not satisfied. Specifically, the ALJ found plaintiff has no restrictions in his daily living activities, mild restrictions in his social functioning, and moderate restrictions regarding his concentration, persistence, or pace. (Tr. 17) He has experienced no episodes of decompensation due to his mental impairments. (Id.)

The ALJ then considered the entire record and determined plaintiff had the RFC to perform light work, but in doing so should not climb ropes, ladders, or scaffolds. Nor should he work around fumes, odors, dust, or gases. He should avoid heights as well. He

---

[3] "Paragraph B and C" criteria are listed in 20 C.F.R. Subpt. P, app. 1, § 12.00.

is able to remember and carry out at least simple instructions and non-detailed tasks. (Tr. 18.) At Step Four, the ALJ found plaintiff unable to perform any past relevant work. (Tr. 28.)

Finally, at Step Five, the ALJ, with the testimony of a VE, found work in significant numbers in both the national and state economies that plaintiff would be able to perform. (Tr. 28–29.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140–42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his impairment meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred by failing to properly assess his residual function capacity, because the ALJ failed to properly consider the medical opinions of Dr. Elterman, Nurse Practitioner Murdick, and the two non-examining state physicians. This court disagrees.

### A. Dr. Elterman's Pulmonary and Hypertension Opinions

Plaintiff argues that the ALJ failed to properly consider the limitations on him due to his hypertension and COPD. This failure, plaintiff argues, resulted in his RFC not properly reflecting his true capabilities. (Doc. 17 at 7.) The Commissioner argues that the ALJ gave proper weight to the medical records and opinions provided by Dr. Elterman. However, the Commissioner argues that Dr. Elterman's conclusion that plaintiff was disabled and unable to work was properly disregarded by the ALJ as a legal conclusion left to the Commissioner alone. (Doc. 22 at 5.)

The opinion of a treating physician will be given "controlling weight" only if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012–13 (8th Cir. 2000). The record, though, should be "evaluated as a whole." Id. at 1013 (quoting Bentley v. Shalala, 52 F.3d 784, 785-86 (8th Cir. 1997)). Impairments are not considered disabling when they can be controlled by proper use of medication. Brown v. Barnhart, 390 F.3d 535, 540–41 (8th Cir. 2004) (finding no disability because claimant's hypertension could be controlled with medication, which she chose not to take). Also a plaintiff's own actions which affect his impairments may be considered when evaluating the severity of an impairment. Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (missing appointments, failing to take medications, continuing smoking all contributed to finding no disability); Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (plaintiff's continued smoking, against physician's advice, contributed to plaintiff's pulmonary problems). Finally, a doctor's opinion that a claimant is disabled and cannot sustain employment is not a medical diagnosis and is not entitled to any weight. See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007).

Plaintiff argues that Dr. Elterman's opinions were not given their due weight and the ALJ specifically ignored Dr. Elterman's 2010 and 2011 statements, that plaintiff could not work. (Doc. 17 at 7.) Dr. Elterman's report in 2010 stated that plaintiff had shortness of breath, but his asthma attacks were only moderately severe. (Tr. 576.) He assessed plaintiff's prognosis as guarded, but then failed to provide any limitation assessments on the form report. (Tr. 578–80.) In 2011, Dr. Elterman provided a short statement that in his professional opinion, "Mr. Harmon cannot work due to his high blood pressure and COPD." (Tr. 707.) No medical reasoning or limitations were provided to support this assessment. These are legal conclusions made by physicians which invade the province of the Commissioner and are entitled to no weight. See House, 500 F.3d at 745.

The ALJ provided two pages of reasoning regarding plaintiff's COPD. (Tr. 20–22.) He detailed all of plaintiff's doctor appointments and emergency room visits and

noted there were no abnormal chest x-rays and no doctor stated plaintiff was incapacitated due to his COPD. (Tr. 20–22.) This included the March 2009 pulmonary function study by Dr. Elterman that found a significant response to plaintiff's COPD with use of his inhaler. (Tr. 20.) Additionally, all of the medical records indicate that his medications remained stable. (Tr. 21.) Conditions which are controlled through treatment and medications cannot be considered disabling. Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004). The ALJ also noted that it was recommended by all of plaintiff's doctors that plaintiff cease smoking cigarettes and marijuana. (Tr. 447, 455, 498, 622–27, 654–70, 705, 801–03, 840, 1069–70, 1177–78.) Failure to follow a doctor's recommendations may be considered when assessing plaintiff's true limitations. See Brown, 390 F.3d at 540. The last assessment of plaintiff's pulmonary health occurred in 2013, when Dr. Waltmann, M.D., stated she could find "no pulmonary reason [plaintiff] could not work." (Tr. 1176–78.) Even though neither of plaintiff's primary care doctors stated exactly what limitations should be placed on plaintiff, the ALJ accounted for plaintiff's COPD and asthma by limiting plaintiff's exposure to fumes, odors, dust, and gases. (Tr. 18.) Substantial evidence supports the ALJ's RFC finding regarding plaintiff's pulmonary abilities and limitations.

### B. Nurse Practitioner Janet Murdick's Psychiatric Opinion

Plaintiff argues that the ALJ wrongly discredited the opinion of Nurse Practitioner Murdick, because she is a non-acceptable medical source. (Doc. 17 at 8.) Defendant argues that because Murdock is a non-acceptable medical source, she cannot be a treating source and, therefore, her opinion is not entitled to controlling weight. (Doc. 22 at 6–7.) Furthermore, the Commissioner argues that the ALJ discussed Murdock's opinion but did not find it entirely credible, because it was inconsistent with the record as a whole. (Id. at 7–8.)

Regarding mental health conditions, only licensed physicians and licensed or certified psychologists are considered acceptable medical sources. SSR 06-03P at *1

(Aug. 9, 2006). Acceptable medical sources are the only ones who may establish the existence of a medically determinable impairment; give a medical opinion; or be considered a treating source, and thereby entitled to controlling weight. Id. at *2. Other sources, such as nurse practitioners, may be used to assess the severity of the claimant's impairment and how it affects his ability to function. Id. at *2. A non-acceptable source can opine on symptoms, diagnosis and prognosis, physical and mental symptoms, as well as what the claimant can do despite the impairment(s). Id. at *5. The non-acceptable source is evaluated based on several factors: (1) duration and frequency of the relationship with the claimant; (2) consistency of the opinion with the record; (3) relevance of the evidence with the opinion; (4) explanation of the opinion; and (5) any other factors which support or refute the opinion. Id. at *4–5.

> Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

Id. at *6.

However, like all medical sources, a nurse practitioner's opinion can be afforded less or no weight if it is not supported by the other objective medical evidence. See Travis v. Astrue, 477 F.3d 1037, 1041 (8th Cir. 2007); SSR 06-03P at *6. Situational depression is typically not severe enough to be disabling. See Gates v. Astrue, 627 F.3d 1080, 1082–83 (8th Cir. 2010) (situational depression because plaintiff is not compliant with treatment is not disabling); Buchanan v. Colvin, No. 4:13 CV 1079 TCM, 2014 WL 4205175, at *13 (E.D. Mo. Aug. 22, 2014) (same). Finally, if a condition can be managed by adherence to a physician's advice and medications, the condition cannot be considered disabling. Brown, 390 F.3d at 540.

The ALJ considered Nurse Murdick's treatment notes, when legible, into the decision. The ALJ did not, however, give credence to the mental RFC assessment form

due to her status as a non-acceptable source as well as its conflict with the record as a whole. (Tr. 23–26.) From the entire medical record the ALJ determined that plaintiff's anxiety was situational and often due to his own noncompliance with his medications. On November 12, 2007, he went to the emergency room and admitted to taking pills earlier in the week, but vomited them. This was, however, during the time which the police arrested him for violating the restraining order against him. (Tr. 508–09, 687.) On April 2, 2011, plaintiff was admitted to the hospital after disability was denied. (Tr. 804.) On April 14, 2001 plaintiff was admitted for erratic behavior likely due to polysubstance abuse. (Tr. 721–741, 801–03.) Additionally, during some of these times, plaintiff either had a temporary job or continued to look for work. (Tr. 474, 474, 568, 690, 692, 693.) On November 29, 2007, August 5, 2010, June 3, 2011, July 13, 2011, July 27, 2011, and August 19, 2011, plaintiff ran out of his psychiatric medications and either went to his VA practitioner or the emergency room seeking a refill. Often plaintiff did this after his anxiety symptoms became problematic. (Tr. 477–78, 570, 697, 746–64, 1113–14, 1117–18, 1142.) Additionally, his substance abuse and withholding of prescription information from his VA physicians also contributed to his altered mental states. (Tr. 25, 802, 854–55.) Conversely, when plaintiff was complaint with his medications, he reported feeling better. (Tr. 1051, 1081, 1093.) This was also reflected in his GAF score which was reported as low as 38 by Nurse Murdick on July 30, 2007, but had improved to 62 during 2010 and was last reported as 55 on June 18, 2012 by Nurse Gleason at the VA. (Tr. 486, 675–680, 1082.) A GAF score in the 50s indicates a person may have moderate symptoms or moderate difficulty in social or occupational functioning. DSM IV at 34. This GAF score conflicts with Nurse Murdick's own assessment that plaintiff would be unable to meet competitive standards. The ALJ applied plaintiff's symptoms and limitations supported by the record as a whole by limiting plaintiff to "simple instructions and non-detailed tasks." The ALJ properly failed to accept Nurse Murdick's mental RFC assessment in its entirety.

## C. Non-Examining Medical Source Opinions

Finally, plaintiff argues that the non-examining source, Joan Singer, Ph.D., was rejected without a rationale. (Doc. 17 at 10.) The Commissioner argues that the ALJ provided a rationale for affording Dr. Singer's opinion less weight.

An ALJ should state whether she discounts a physician's findings and explain why she has discounted them. Grable v. Colvin, 770 F.3d 1196, 1201–02 (8th Cir. 2014); McCadney v. Astrue, 519 F.3d 764, 765 (8th Cir. 2008). However, a deficiency in opinion-writing is "'not a sufficient reason for setting aside an administrative finding' where the record supports the overall determination." Scott ex rel. Scott v. Astrue, 539 F.3d 818, 822 (8th Cir. 2008). The explanation given by the ALJ must be substantial enough to allow for meaningful judicial review. Id.

The ALJ discounted Dr. Singer's mental RFC assessment and her psychiatric review of plaintiff. (Tr. 26.) The ALJ clearly stated that Dr. Singer's opinon was rendered prior to the nurse practitioner's medical source statement and other mental health treatment. (Tr. 26.) After Dr. Singer's opinon was provided on October 1, 2009 (Tr. 536–549), plaintiff's GAF increased to a maximum of 62, at its highest, and remained in the 50s, except when he was not adhering to his medication regime. (Tr. 675–80, 845–54, 1082.) Additionally, after Dr. Singer provided her opinion, which described his severity as only "partially credible," plaintiff had several episodes of running out of his prescribed medication. This resulted in an increase of his anxiety and depression. The claimant's own noncompliance with medical recommendations and prescribed treatments may be considered for various reasons, including credibility of subjective complaints. See e.g., Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (discrediting claimant's subjective complaints due to her noncompliance with prescribed diet and medications); Owen, 551 F.3d at 800 (discrediting a medical opinion because it failed to also consider claimant's noncompliance); Brown v. Barnhart, 390 F.3d 535, 540-41 (8th Cir. 2004) (finding no disability because claimant's hypertension could be controlled with medication, which she chose not to take). Although the ALJ failed to mention Dr. Singer's RFC assessment of

plaintiff's pulmonary and back limitations, the RFC already sufficiently limited the plaintiff to avoiding fumes, odors, dust, gases, climbing ropes, ladders, scaffolds, and heights for his COPD, asthma, and lower back problems. (Tr. 18.) The ALJ properly listed her reasons to disregard the opinion of Dr. Singer, and even if the ALJ's opinion was not detailed enough in this regard, the error was harmless.

### D. Hypothetical Question

Plaintiff argues that the hypothetical question presented to the VE did not accurately capture his impairments. (Doc. 17 at 11.) Defendant argues that, as long as it was clear to the VE what plaintiff's limitations would be, the description is sufficient. (Doc. 22 at 8.)

A hypothetical question must accurately capture the limitations of a plaintiff in order for it to be considered substantial evidence. Howard v. Massanari, 255 F.3d 577 (8th Cir. 2001); Meyerpeter v. Astrue, 902 F. Supp. 2d 1219, 1232 (E.D. Mo. 2012). However the hypothetical "need not use specific diagnostic or symptomatic terms where other descriptive terms can adequately define the claimant's impairments." Howard, 255 F.3d at 577. Additionally, if the omission or wording would have had no effect on the VE's assessment, it is harmless error. Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007); Meyerpeter, 902 F. Supp. 2d at 1232.

The ALJ's hypothetical question described a person who would be limited to light exertional work, and avoiding ropes, ladders, scaffolding, hazardous heights, fumes, odors, dust, and gases. The hypothetical person would also be limited to unskilled work. The ALJ's written opinion describes the RFC as only allowing plaintiff to perform "simple instructions or non-detailed tasks." During the hearing, the VE defined "unskilled work" as that work which only requires the ability to understand, remember, and carry out at least simple instructions and non-detailed tasks. (Doc. 22 at 8.) This description is reflected in the ALJ's limitations for plaintiff's RFC finding. Therefore, the VE's

determination that plaintiff could perform jobs that exist in the local and national economies is supported by substantial evidence.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


_____
         S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on September 22, 2015